Robert J. Quigley
(CA Bar 302879)
**WEITZ & LUXENBERG, P.C.**
1880 Century Park E, Suite 700
Los Angeles, CA 90067
Telephone: 212-558-5829
rquigley@weitzlux.com

*Attorney for Plaintiff (additional attorneys listed below)*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN SCHRAMM, | |
| Plaintiff, | Case No. |
| v. | |
| MONSANTO COMPANY, | |
| Defendant. | |

## COMPLAINT AND JURY TRIAL DEMAND

COMES NOW Plaintiff Glenn Schramm (Plaintiff), by and through his undersigned counsel, and for his causes of action against Defendant Monsanto Company (Defendant or Monsanto), alleging the following upon information and belief, except those allegations that pertain to Plaintiff, which are based on personal knowledge:

## INTRODUCTION

1.    All claims in this action are a direct and proximate result of Defendant's negligent, willful, reckless, and wrongful conduct in connection with the design, development, manufacture, failure to test, packaging, promotion, marketing, advertising, distribution, labeling, and/or sale of

glyphosate-based herbicides, primarily, but not exclusively, Roundup, which, as used throughout, refers to all formulations of Roundup products and all Defendant's glyphosate-based herbicides.[1]

2.     Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked and still lacks adequate warnings and directions as to the risks associated with its use and lack of appropriate testing.

3.     This personal injury lawsuit arises from scientific evidence that causally links exposure to Roundup – including glyphosate and its related surfactants, adjuvants, impurities, and contaminants – to Non-Hodgkin Lymphoma (NHL). For decades, Roundup users, such as agricultural workers, landscapers, and home gardeners, including Plaintiff, have used Roundup, unaware that their use and exposure was increasing their risk of developing NHL.

4.     Defendant knew, or was negligent in not knowing, that glyphosate and Roundup are carcinogenic. Defendant failed to adequately inform and warn the public, generally, and the Plaintiff, specifically, of the serious health risks associated with the use of, and exposure to, glyphosate-based formulations and/or Roundup.

---

[1] Roundup refers to all formulations of Defendant's Roundup products, including but not limited to Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fender and Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup QuikPro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Preventer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use 1, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

5.      Defendant has made and continues to make representations stating that Roundup does not present a human health risk and that it was, and is, safer than ordinary household items.

6.      Defendant made its representations with the intent of inducing the purchase and use of Roundup for Defendant's financial gain. Further, Defendant made its representations with a reckless indifference to the safety and well-being of those individuals who used or were exposed to Roundup.

7.      Plaintiff seeks recovery for all damages as a result of developing NHL. Defendant's wrongful conduct, including the concealment of the unreasonably dangerous and defective nature of Roundup, directly and proximately caused Plaintiff's injuries and the attendant effects of developing and undergoing treatment for NHL. Given Defendant's asymmetric and unilateral access to information pertaining to Roundup's dangers, Plaintiff's injuries, like those affecting thousands of similarly situated victims across the country, were avoidable.

## THE PARTIES

### PLAINTIFF GLENN SCHRAMM

8.      Plaintiff Glenn Schramm is a citizen of the State of California and was born on January 28, 1952. Glenn Schramm resides in the City of Santa Rosa, County of Sonoma.

9.      Plaintiff was first exposed to Roundup in Akron, Ohio in or around 1977. His exposure to Roundup continued for approximately 33 years.

10.     For many years, Plaintiff used and was exposed to Roundup on a regular basis. Plaintiff followed Monsanto's instructions when he used Roundup.

11.     Plaintiff was diagnosed with B-Cell Lymphoma, a subtype of NHL, in Santa Rosa, California at Sutter Health in 2025. Plaintiff suffered, and continues to suffer, the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of

Roundup and Defendant's negligent, willful, reckless, and wrongful conduct in the design, research, development, failure to test, manufacture, production, promotion, distribution, advertising, packaging, labeling, marketing, and sale of Roundup.

12.    As a direct and proximate result of these injuries, Plaintiff has incurred and will continue to incur medical expenses, and has endured and will continue to endure physical, mental, emotional, and psychological pain and suffering and loss of enjoyment of life, and otherwise has been personally and financially injured.

13.    During the entire time that Plaintiff was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

### DEFENDANT MONSANTO COMPANY

14.    Defendant is a multinational agricultural biotechnology corporation organized under Delaware law with its headquarters and principal place of business in St. Louis, Missouri. At all relevant times, Monsanto regularly conducted, transacted, and solicited business in Missouri, as well as in all States of the United States.

15.    Monsanto discovered the herbicidal properties of glyphosate and the designed and manufactured Roundup, which contains glyphosate and other ingredients, including, but not limited to the surfactant polyethoxylated tallowamine (POEA). Defendant made and continues to make scientific, manufacturing, design, packaging, labeling, advertising, marketing, sales, and other business decisions regarding Roundup.

16.    At all times relevant to this complaint, Monsanto manufactured, marketed, tested, promoted, sold, and/or distributed Roundup in Missouri, and continues to do so.

17.    At all relevant times, Monsanto had, and continues to have, continuous and systematic contact with and conducts business in and from Missouri, such that it has purposefully

availed itself of the laws of the State and expects both to sue and to be sued in Missouri. In the alternative, Monsanto's presence in Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it, Monsanto's domicile in Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it and/or Monsanto has consented to the exercise of jurisdiction over it by Missouri courts by registering to and conducting business from Missouri.

18.     At the time of filing of this petition, Defendant's registered agent is St. Louis County Registered Agents Corp., whose registered office is presently located in St. Louis County at 12213 Big Bend Rd., St. Louis, MO 63122.

19.     In 2018, Bayer, a multinational pharmaceutical and chemical company, acquired Monsanto for $63 billion.

## VENUE AND JURISDICTION

20.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of California, a different state than the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold throughout the State of California, and, more specifically, caused Roundup® to be sold to Plaintiff and/or Plaintiff's employers in the State of California.

22.     In addition, Monsanto maintains sufficient contacts with the State of California such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

23.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiff lives in and was diagnosed in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Furthermore, Monsanto sells, markets, and/or distributes Roundup® within the District. As such, a substantial part of the acts and/or omissions giving rise to these claims occurred within the District.

## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

24.     In 1970, Monsanto discovered the herbicidal properties of glyphosate. It subsequently began to design, research, manufacture, sell and distribute glyphosate-based herbicides, including, but not exclusively, under the name Roundup.

25.     Glyphosate-based herbicides, such as Roundup, are broad-spectrum, non-selective herbicides used in a wide variety of settings around the world, including agricultural, landscaping, public maintenance, and residential uses.

26.     "Non-selective" herbicides kill plants indiscriminately. Glyphosate works by inhibiting a plant enzyme, 5-enolpyruvyshikimate-3-phosphate synthase, thereby interfering with the "shikimic pathway", resulting in the accumulation of shikimic acid in plant tissue and, ultimately, plant death.

27.     Roundup sprayed on plants is absorbed through their leaves and translocates throughout the plant where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling crops on which it had been sprayed or by milling, baking, or brewing grains.

28.     In addition to glyphosate, to be efficacious, Roundup contains one or more surfactants (such as POEA), which both facilitate glyphosate's absorption into the plant and have herbicidal properties of their own, as well as other adjuvants.

29.     When used in its intended and/or a reasonably foreseeable manner, Roundup aerosolizes and contaminates the ambient air.

30.     Each year, approximately 280 million pounds of glyphosate-based products are sprayed on crops, commercial nurseries, lawns, parks, and golf courses. This usage has been driven largely by and is inextricably intertwined with the proliferation of genetically engineered glyphosate-resistant crops beginning in the mid-1990s.

31.     As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are "Roundup Ready" glyphosate-resistant seeds. Defendant was and is directly involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified organism (GMO) crops, many of which are "Roundup Ready." The stated advantage of Roundup Ready crops is that they allow Roundup/glyphosate to be sprayed on and over crops in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States used Roundup Ready seeds.[3] Monsanto had been and is currently able to secure its dominant market position in the glyphosate-based herbicide market through a marketing strategy that couples proprietary Roundup Ready seeds with continued sales of Roundup.

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

COMPLAINT AND JURY TRIAL DEMAND

32.    Monsanto introduced and first marketed Roundup in 1974.

33.    "The largest use [of glyphosate (like Roundup®)] is in agriculture. The agricultural use of glyphosate has increased sharply since the development of crops that have been genetically modified to make them resistant to glyphosate. Glyphosate is also used in forestry, urban, and home applications."[4]

34.    Today, glyphosate-based herbicides products are among the world's most widely used herbicides. Monsanto's glyphosate-based herbicides are registered in 130 countries and are used on over 100 different crops.[5] Glyphosate is, thereby, ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[6] It has been found in food,[7] in the urine of agricultural workers,[8] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[9]

35.    On March 20, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate-based herbicides, classifying glyphosate as a "probable human carcinogen."

---

[4] March 20, 2015, International Agency for Research on Cancer (IARC), "IARC Monographs Volume 11: evaluation of five organophosphate insecticides and herbicides"

[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

8

That evaluation was based, in part, on epidemiological studies of human exposures to glyphosate in several countries around the world and also included reviews of animal studies and cellular studies.

36.     On July 29, 2015, IARC issued its formal "monograph" related to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate, including glyphosate exposure in humans and classified glyphosate as a Group 2A carcinogen, which means that it is probably carcinogenic to humans.

37.     The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHLs and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, and B-cell lymphoma.[10]

38.     The IARC evaluation is significant to public health as it confirms that glyphosate is a probable human carcinogen.

39.     Nevertheless, Monsanto, since it began selling Roundup in 1974, and even after the IARC monograph, has represented that its Roundup products are safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to U.S. consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

40.     Bayer AG (Monsanto's parent company) continues to misrepresent on its website that there is no scientific support for Roundup causing NHL. For example, Bayer AG states publicly that, "We stand fully behind the safety of our glyphosate products." Bayer AG further

---

[10] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

states on its website that "[t]he measures Bayer is taking are not admissions of legal liability or wrongdoing but are the result of the mass tort system in the U.S. . . ."[11]

41.    Despite IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continues to withhold that information from consumers and continues to represent and maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrants to consumers that objective scientists and regulatory agencies agree that there is an absence of evidence establishing carcinogenicity or genotoxicity of glyphosate and Roundup.

42.    Defendant's misrepresentations are consistent with Defendant's insouciant approach to ensuring the safety of its products, the safety and well-being of the general public and the safety of Plaintiff, despite its public pledge that the safety of its products is its highest priority.

43.    For 50 years, commercial users, agricultural workers, landscapers, arborists, horticulturalists, other professionals, and consumers across the world have used Roundup without being warned of the dangers of its use. That is because, since Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill weeds without causing harm to people or to the environment. Scientific evidence has revealed this to be patently false.

44.    Monsanto has repeatedly, for decades, claimed, advertised, and marketed Roundup as being harmless to the public. To support these false claims, Monsanto has acted negligently, willfully, and recklessly, including through actions such as seeding the scientific literature with ghostwritten publications and repeatedly and consistently attacking legitimate studies that reveal

---

[11] *Managing the Roundup Litigation*, Bayer AG, https://www.bayer.com/en/managing-the-roundup-litigation (last visited Jan. 14, 2026).

COMPLAINT AND JURY TRIAL DEMAND

Roundup's dangerous properties. Monsanto has conducted an extensive and targeted campaign of misinformation to convince government agencies, users of Roundup and the general population that Roundup is safe.

### Registration of Herbicides Under Federal Law

45.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA or Act), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency (EPA or Agency) prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

46.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA, as part of the registration process, requires, among other things, the manufacturer to conduct a variety of tests to evaluate the potential risks from exposure, including toxicity to people and other potential non-target organisms, and other adverse effects on the environment. EPA does not require a human health study because testing a pesticide on a human being to determine its toxicity would be unethical.

47.     Registration by the EPA is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

48.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be

granted or a pesticide allowed to continue to be sold in commerce once its dangers become suspected or known.

49.    The EPA registered Roundup for distribution, sale, and manufacture in the United States in 1974.

50.    FIFRA requires the registrant, Monsanto in the case of Roundup, to conduct health and safety testing of pesticides, primarily of the supposed "active" ingredient, on rodents. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. Each registrant must submit to the EPA for review and evaluation of all data generated from testing. Data and information obtained after registration involving the safety of an already registered herbicide, must be provided, under FIFRA, by the registrant to the EPA. The government is not required to and does not perform its own tests on pesticides/herbicides. At all times, this obligation is the registrant's, here Monsanto.

51.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

52.    In 1971, Monsanto hired a testing laboratory called Industrial Bio-Test Laboratories (IBT) to conduct most of the animal toxicology studies that would be necessary for EPA registration of glyphosate. These included studies for oncogenicity. Oncogenicity studies required for herbicide registration are long-term (usually 18-24 month) feeding studies conducted on two different animal species (normally mice and rats). These studies assess the development of both malignant and non-malignant tumors (considered as precursors to malignant tumors) in control groups compared to groups fed low, medium and high doses of the herbicide under study.

An herbicide, including Roundup®, could not be registered without such valid oncogenicity studies.

53.    A former Monsanto toxicologist, Paul Wright, planned and oversaw the glyphosate oncogenicity studies while working at IBT in 1971 and 1972 as the head of IBT's rat and dog study department. In late 1972, Dr. Wright returned to work at Monsanto, where he oversaw and approved the draft IBT glyphosate oncogenicity study reports in 1973 and 1974 before they were submitted to EPA.

54.    In 1974, when Roundup was first approved for registration by the EPA, EPA's decision was premised upon IBT's rodent studies of glyphosate, including the oncogenicity studies overseen by Dr. Wright.

55.    In 1976, the U.S. Food and Drug Administration (FDA) inspected IBT and discovered discrepancies between the raw data and the final reports relating to the toxicological impacts of pesticides and other chemicals IBT had studied. FDA and EPA announced that the U.S. Government would begin auditing approximately 1,000 IBT studies submitted to establish the safety of hundreds of different products, including the studies IBT had performed for Monsanto on glyphosate.

56.    In response to this news, Monsanto did nothing to determine whether the IBT studies supporting glyphosate's registration were valid, did not initiate any repeat testing, and took no steps to inform purchasers and users of Roundup® that the tests supporting the product's safety had been called into question.

57.    In July 1977, IBT executives privately warned Monsanto executives that its glyphosate oncogenicity studies were "likely fraud[ulent]." In response, Monsanto opened its own

in-house laboratory to conduct animal studies, headed by the same toxicologist, Paul Wright, who had overseen IBT's glyphosate oncogenicity studies from 1971 through 1974.

58.    Although Section 6(a) of FIFRA required Monsanto to notify EPA of "additional factual information regarding unreasonable adverse effects" of its product, Monsanto did not inform EPA of IBT's report of likely fraud in the oncogenicity studies used to demonstrate glyphosate's safety.

59.    Monsanto had several options upon learning that IBT's glyphosate cancer studies were likely fraudulent, including voluntarily suspending the sale of Roundup® until valid cancer studies could be completed and the EPA had an opportunity to evaluate the results, or warning consumers that there were no valid cancer studies for glyphosate. Instead, Monsanto continued to sell Roundup® without cancer warnings of any kind, despite the fact that, by that point, Monsanto was marketing Roundup® around the world.

60.    In August 1978, over a year after Monsanto learned from IBT that the glyphosate carcinogenicity studies were likely fraudulent, the EPA audited IBT's glyphosate animal studies and determined that many of the studies conducted for Monsanto on glyphosate, including the oncogenicity studies overseen by Dr. Wright, were invalid.[12] EPA informed Monsanto that

---

[12] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&Q F
ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=a nonymous&SortMethod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

Monsanto was required to repeat the two cancer studies "as soon as possible" because of the invalid IBT test results.

61.    An EPA reviewer stated, as to IBT's testing generally, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[13]

62.    At that time, the EPA could not suspend Roundup®'s registration because it would have had the burden to demonstrate that Roundup® was not safe – an impossible task, given Monsanto's invalid testing and the fact that EPA does not test manufacturers' products.  Monsanto continued to sell Roundup® and continued to represent to the public that it was safe.

63.    By at least August 1978, Monsanto thus knew beyond doubt that there were no valid cancer studies to support Roundup®'s registration or its representation to the public that Roundup® was safe.

64.    In 1981, several IBT employees were indicted for their fraudulent laboratory practices in connection with studies for Monsanto and other companies. One of those was Monsanto toxicologist Paul Wright. Another was IBT executive Moreno Keplinger, who had signed off on both glyphosate oncogenicity studies. Monsanto paid over a million dollars in legal fees for Dr. Wright's legal defense.

65.    In 1983, after a six-month jury trial, Dr. Wright and Dr. Keplinger were both convicted of fraud and sent to prison.

_____

[13] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

COMPLAINT AND JURY TRIAL DEMAND

66.　　In 1981, four years after IBT's executives had informed it of "likely fraud" in the two glyphosate rodent oncogenicity studies, Monsanto finally completed the first required, repeat oncogenicity study on rats. Monsanto took another two years to complete the required repeat oncogenicity study on mice, submitting it only in 1983.

67.　　At no time between 1977 and 1983 did Monsanto suspend Roundup® sales and remove it from the market until adequate oncogenicity studies could be completed. Nor did Monsanto ever inform customers, such as Plaintiff, via requesting label changes, press releases, advertisements, or any other means, that there were no valid cancer studies supporting Roundup®'s purported safety. To the contrary, Monsanto represented to the public in a series of "Toxicity Bulletins" that "based on a number of animal feeding studies, glyphosate has been shown not to cause cancer."

68.　　These continued misrepresentations, failures to disclose and warn, and failure to adequately test, demonstrate Monsanto's reckless indifference to the health and safety of its customers and the general public.

69.　　In 1985, the EPA classified glyphosate as possibly carcinogenic to humans (Group C) based on the required repeat oncogenicity study on mice, which showed a statistically significant increase of renal tumors. This classification would have had a devastating effect on Roundup®'s sales because it could classify Roundup® as a "restricted use" pesticide (requiring certification to apply Roundup®), require a warning on the Roundup® label, and/or prohibit Roundup®'s use on food crops under the "Delaney Clause" of the Food, Drug and Cosmetics Act.

70.　　Monsanto was well aware of these consequences and immediately strategized how to fight that EPA classification.

71.    After substantial pressure on and a lengthy battle with EPA, Monsanto convinced EPA to find the repeat mouse study "equivocal" and, in 1986, required Monsanto to conduct yet another oncogenicity study on mice.

72.    At the same time in 1986, the EPA also required Monsanto to conduct a second repeat rat oncogenicity study, after finding that Monsanto's first repeat rat oncogenicity study had used woefully low glyphosate doses that made the study meaningless to evaluate glyphosate's cancerous potential.

73.    Despite these required repeat studies, at no point did Monsanto ever pull Roundup® from the market.

74.    Monsanto refused to conduct the second repeat mouse oncogenicity study on glyphosate and, to date, has never conducted such a study.

75.    Thus, from the time of its initial registration in 1974 through 1986, Roundup® was never supported by acceptable oncogenicity testing.

76.    Monsanto also never informed customers and the general public that Roundup®'s purported safety was not supported by valid, adequate cancer testing.

77.    These failures demonstrate Monsanto's reckless indifference to the health and safety of its customers, the general public, and Plaintiffs.

78.    In 1986, the EPA also required Monsanto to place certain worker safety protection instructions and information on its Roundup® labels.

79.    Monsanto refused to label Roundup® with the worker safety protection information sought by the EPA.

80.    In 1985, the United Nations Food and Agricultural Organization (FAO) promulgated an international pesticide industry standard of conduct that the U.S. pesticide

industry association and Monsanto adopted. The FAO periodically amended this international code of conduct with the cooperation of the pesticide industry, including Monsanto. This voluntary industry code of conduct was another standard, in addition to the FIFRA statutory regulatory requirements, by which Monsanto agreed to be bound and by which Monsanto's conduct is to be measured. Monsanto repeatedly violated the FAO standard of conduct.

81.     A third standard which Monsanto was required to abide by and by which its conduct is to be measured is its own public pledge that the safety of its products was its highest priority. As the evidence above and below demonstrates, Monsanto routinely violated and continues to violate that pledge.

82.     In the mid-1980s, Monsanto used the profits from its Roundup® sales to fund biotechnical research, which bore fruit a decade later with the development of genetically modified seeds resistant to glyphosate and Roundup®. The sale and use of such seeds dramatically increased the use of Roundup® and the amount of Roundup® sprayed in the U.S. and worldwide agricultural communities. Again, the development of these seeds allowed Roundup® users to spray Roundup® directly on the crops to kill the weeds without also killing the crops. All the while, Monsanto never informed customers or the general public about the absence of valid cancer studies.

83.     In 1991, based primarily on the second required repeat rat oncogenicity study on glyphosate, the EPA eventually changed its glyphosate classification to evidence of non-carcinogenicity in humans (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time

of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[14]

84.     In a second incident of pesticide testing data falsification, in 1991, Monsanto hired Craven Laboratories to perform herbicide studies, including for glyphosate. That same year, the Craven Laboratories' owner and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in pesticides and herbicides testing.[15]

### *Roundup's Importance to Monsanto's Market Dominance and Profits*

85.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division outperformed its chemicals division's operating income, and that gap increased yearly. With its patent for glyphosate expiring in the United States in 2000, Monsanto needed a strategy to maintain its Roundup market dominance.

86.     In response, Monsanto, as noted above, completed the development of and began sales of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields and over their crops during the growing season without harming the crops. This allowed Monsanto to further expand its market for Roundup. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market

---

[14] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[15] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of Roundup.

87.    Through a three-pronged strategy of increasing production, decreasing prices, and selling Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[16] Today, Roundup remains one of the world's largest herbicides by sales volume.

### *Monsanto Has for Decades Falsely Advertised Roundup's Safety*

88.    In 1996, the New York Attorney General (NYAG) filed a lawsuit against Monsanto for its false and misleading advertising of Roundup. Specifically, the lawsuit challenged Monsanto's general representations that Roundup was "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations that the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

> a)    "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences . . ."

> b)    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

> c)    "Roundup biodegrades into naturally occurring elements."

> d)    "Remember that versatile Roundup herbicide stays

---

[16] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[17]

89.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

        *        *        *

b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

        *        *        *

_____

[17] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

21

c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\*        \*        \*

d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*        \*        \*

e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

\*        \*        \*

f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

90.    Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, it still has not done so today.

91.    What is more, Defendants did not even stop their misleading advertising in New York. In June 2023, the NYAG announced that Bayer will pay $6.9 million for falsely advertising in New York that Roundup® is safe and non-toxic.

92.    Another example of such false advertising occurred in France. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised Roundup® as "biodegradable" and that it "left the soil clean."[18]

---

[18] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308395.stm.

COMPLAINT AND JURY TRIAL DEMAND

93.     Defendants continue to falsely and misleadingly represent that glyphosate works on an enzyme found in plants but not in humans.

94.     Defendants continue to falsely and misleadingly promote Roundup®'s purported safety in violation of FIFRA, the FAO code of conduct, and their own self-imposed safety standard, including by comparing Roundup's safety to that of other common household products such as chocolate, apple cider vinegar, and coffee. Such conduct evidences Defendants' reckless indifference to the health and safety of its customers and the general public.

95.     What is more, Monsanto did not even stop their misleading advertising in New York. In June 2023, the NYAG announced that Bayer (Monsanto's parent company) will pay $6.9 million for falsely advertising in New York that Roundup is safe and non-toxic.

96.     Another example of such false advertising occurred in France. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

***Monsanto Deliberately Withheld Its Own Negative Genotoxicity Findings from the EPA, Violating FIFRA's Requirements***

97.     Starting in the early-1990s, peer-reviewed published scientific studies demonstrating that glyphosate and Roundup were genotoxic – i.e., capable of causing DNA damage – began proliferating.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

COMPLAINT AND JURY TRIAL DEMAND

98.　　In response, Monsanto hired genotoxicologist Dr. James Parry, who it considered to be world-renowned, to review those studies, evaluate glyphosate's and Roundup®'s potential for genotoxicity, and make safety recommendations.

99.　　Dr. Parry provided Monsanto with a report that concluded that the studies provide evidence that glyphosate is capable of "producing genotoxicity."

100.　　Dr. Parry also recommended to Monsanto that it conduct genotoxicity studies on glyphosate and Roundup®. Monsanto subsequently fired Dr. Parry and required him to sign a non-disclosure agreement.

101.　　FIFRA required Monsanto to provide EPA with Dr. Parry's reports. Monsanto never did so. Nor did Monsanto conduct the testing Dr. Parry recommended. Such conduct evidences Monsanto's reckless indifference to the health and safety of its customers and the general public and its breach of duty.

***Monsanto Committed Academic Fraud in "Ghostwriting" Articles Touting Glyphosate's and Roundup®'s Safety***

102.　　Beginning in the late-1990s, Monsanto formulated a plan to develop positive public relations material regarding glyphosate and Roundup® by ghostwriting favorable articles.

103.　　Ghostwriting is when a company with a financial interest in a study, like Monsanto, writes a favorable manuscript (or portion of a manuscript) about one of its products to be submitted for publication, and then finds individuals to read the manuscript and agree to be listed as authors without any attribution that the real author is actually the company. This practice is unequivocally unethical.

104.　　Monsanto ghostwrote a comprehensive assessment of the human health aspects of glyphosate/Roundup® in a 2000 publication in the journal *Regulatory Toxicology and Pharmacology* called "Safety evaluation and risk assessment of the herbicide Roundup® and its

active ingredient, glyphosate, for humans" by Williams, Kroes, and Munro. Monsanto formulated the public relations plan to ghostwrite this article years earlier and the "Acknowledgment" of the article (written by Monsanto) does not inform the reader that Monsanto wrote it in whole or in part.

105.    After the article's publication, the ghostwriting participants were hailed inside Monsanto for their tremendous years' worth of work, and all were assured that the hard work by the Monsanto public affairs group in utilizing the ghostwritten article would begin. The purpose of the article was "in defending or building Roundup® sales." Even one of Monsanto's top executives Hugh Grant told the ghostwriting team, "This is very good work, well done to the team, please keep me in the loop as you build the PR info to go with it."

106.    The ghostwriting was disclosed during legal proceedings against Monsanto in 2017.[20] A 2025 article in the Journal of Environmental Science & Policy investigated the impact this paper has had on academic research and policy decisions since its publication. The authors report that, among 22,280 papers whose titles or abstracts contain the word "glyphosate," Monsanto's ghostwritten article was cited 822 times, making it the ninth-most-cited paper and placing it in the top 0.1% of the most influential glyphosate studies over the last 25 years. This includes citations in 36 separate international regulatory policy decision documents, 29 of which do not mention its ghostwritten origin. Indeed, the 2020 Toxicological Profile for Glyphosate by the Agency for Toxic Substances and Disease Registry (ATSDR), a division of the Centers for

---

[20] Gillam, C., 2017. *Whitewash: The story of a weed killer, cancer, and the corruption of science*. Island Press. ISBN: 9781610918336.

COMPLAINT AND JURY TRIAL DEMAND

Disease Control and Prevention (CDC), cited this study several times as evidence of glyphosate's toxicokinetic effects and low absorption rates.[21]

107.    For twenty-five years after its publication, Monsanto used this ghostwritten article for public relations, promotional purposes, and regulatory agencies.

108.    In December 2025, the editors of *Regulatory Toxicology and Pharmacology* retracted the ghostwritten Williams article, citing "the potential biases introduced by undisclosed contributions from Monsanto employees and the exclusion of other existing long-term carcinogenicity studies [that] may have skewed the interpretation of the data."[22] The editors found particularly unacceptable Monsanto employees' "contribut[ions] to the writing of the article without proper acknowledgement as authors": "This lack of transparency raises serious ethical concerns regarding the independence and accountability of the authors of this article and the academic integrity of the carcinogenicity studies presented."

109.    The ghostwriting, publication, and promotional uses of the Williams article were consistent with Monsanto President and CEO Henrik Verfaillie's admonition in Monsanto's 2000 Annual Report that, "Next to defending the growth of Roundup®, rejuvenating the growth of products improved through biotechnology is our highest priority."

110.    Falsely maintaining Roundup®'s safety façade was critical to Monsanto's existence as Roundup® was Monsanto's best-selling product, accounting for 48% of total

---

[21] Alexander A. Kaurov, Naomi Oreskes, *The afterlife of a ghost-written paper: How corporate authorship shaped two decades of glyphosate safety discourse*, Environmental Science & Policy, Volume 171, 2025, 104160, ISSN 1462-9011, *available at* https://doi.org/10.1016/j.envsci.2025.104160.

[22] Van den Berg, M., *Retraction Notice for "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans,"* Regul Toxicol Pharmacol., published online December 2025, available at http://www.doi.org/10.1006/rtph.1999.1371.

company sales. As Monsanto stated in the same Annual Report, "Monsanto's success depends on our ability to sustain growth for a product that has been a market leader for three decades."

111.   Throughout the years, Monsanto also ghostwrote other "scientific" articles, as well as popular press articles, particularly to combat IARC's 2015 classification of glyphosate as a probable human carcinogen, discussed below.

***Monsanto Withheld Dermal Absorption Studies from the EPA in Violation of FIFRA***

112.   Individuals, such as Plaintiff, are exposed to glyphosate/Roundup® through various routes, all of which lead to glyphosate/Roundup® translocating into their circulatory system. These routes include dermal absorption, inhalation, ocular absorption, and ingestion. The primary route of exposure is dermal absorption – the movement of glyphosate through the skin and into the bloodstream. This is because Roundup® includes a powerful surfactant, or "surface acting chemical agent" that breaks down the cellular defenses in the surface of skin and thus acts to facilitate Roundup's penetration of the skin and into human cells.

113.   Since the initial sale of Roundup®, Monsanto knew of these pathways of exposure. A "risk assessment" is a process used to identify potential hazards of a substance, such as a herbicide like glyphosate and Roundup. The risk assessments of glyphosate were dependent on several factors, one of the critical ones being the percentage of dermal absorption that occurred when Roundup® got on, and remained on, one's skin. Generally, an absorption level above 3% demonstrates a significant risk.

114.   In late-2000/early-2001, the European authorities required Monsanto to update its glyphosate risk assessment. To do so, Monsanto retained TNO, a laboratory that had previously performed its dermal absorption studies, to conduct absorption studies using glyphosate and Roundup® on both rat and human skin.

115.    In early 2002, Monsanto received preliminary test results from TNO for the rat skin portion of the glyphosate/Roundup® studies. These results demonstrated a much higher than 3% dermal absorption rate and sent shockwaves of concern through Monsanto.

116.    Rather than addressing the results, Monsanto terminated the study, expressing concern about the "potential for this work to blow Roundup® risk evaluations," and buried the TNO study results in its archives.

117.    Monsanto also refused TNO's offer to repeat the study for fear of similar results.

118.    Although Monsanto was well aware of FIFRA's requirement to provide EPA promptly with information, including preliminary results, regarding adverse health effects of glyphosate/Roundup®, Monsanto never provided EPA with any information regarding the TNO dermal absorption studies. Such conduct, once again, highlights Defendant's reckless indifference to the health and safety of consumers such as Plaintiff.

119.    Over the next decades, Monsanto continued to market Roundup® in false and misleading ways, including failing to inform users, such as Plaintiffs, and the general public via the Roundup® label or any other means, of genotoxicity or dermal absorption concerns. In fact, concentrated Roundup® containers have a prominent color graphic on the front of the label showing a bare hand pouring the concentrate into a spray bottle. Commercials and other advertisements showed home users spraying Roundup wearing, for example, shorts, short sleeve shirts, no gloves. Monsanto never disclosed the information about dermal absorption, and they did not warn consumers like Plaintiffs to wear chemically resistant gloves or protective equipment.

120.    At all times relevant to Plaintiffs' claims, safer alternative designs and formulations existed for Roundup®. For example, in 2016 the European Union recommended

that its member states ban the use of Roundup® formulated with the POEA surfactant that has been shown to facilitate Roundup's penetration of the skin and into human cells. Monsanto promptly began to sell Roundup® in Europe for agricultural and non-agricultural uses, formulated with a non-POEA surfactant. IBT did not make those changes in the United States. In 2021, Monsanto sought patent-protection for a glyphosate-free Roundup®, formulated with a combination of chemicals that had been used in other applications for decades. After the patent was granted, Monsanto ceased selling glyphosate-based Roundup® in the United States for residential use and began marketing its new glyphosate-free Roundup® in its place.

### *Classifications and Assessments of Glyphosate*

121.    The IARC process for evaluating whether a chemical is a carcinogen follows stringent procedures. IARC followed those procedures when it evaluated glyphosate. Over time, the IARC Monograph program has reviewed 980 chemical agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic. Glyphosate is classified by IARC as a Group 2A probable human carcinogen.

122.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[23] Panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest, perform the evaluations.

---

[23] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

123. In advance of the IARC meeting, when the experts get together in person to evaluate agents, the panel members are provided data and other materials about the chemicals subject to evaluation, and each subgroup discusses their topic and drafts their sections. At the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Following the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the final Monograph is published.

124. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

125. In March 2015, IARC assessed glyphosate and determined it to be a Group 2A agent, *i.e.*, probably carcinogenic to humans.

126. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

127.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL.

128.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study of community residents reported increases in blood markers of chromosomal damage (micronuclei) after spraying glyphosate formulations.

129.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

130.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

131.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[24] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

### *Earlier Findings About Glyphosate's Dangers to Human Health*

132.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

---

[24] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[25]

133.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[26]

### *The Toxicity of Other Ingredients in Roundup*

134.   In addition to the toxicity of the purported "active" ingredient, glyphosate, several studies show that the glyphosate-based formulation in Defendant's Roundup is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[27]

---

[25] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.
[26] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[27] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

COMPLAINT AND JURY TRIAL DEMAND

135.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[28]

136.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.[29]

137.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in

---

[28] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

COMPLAINT AND JURY TRIAL DEMAND

Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.[30]

138.    Monsanto had and has access to these studies at all times, including through the present.

139.    In 2013, Robin Mesnage and Gilles-Éric Séralini conducted an extensive study on the composition and toxicity of the ingredients in 9 different glyphosate-based herbicide formulations. They compared the toxicity of different brands of glyphosate-based herbicides in human liver, embryonic, and placental tissue cell cultures, and found that several commercial formulations were up to 1,000 times more toxic than glyphosate alone. Mesnage and colleagues demonstrated that the toxicity of glyphosate-based formulations was proportional to their concentration of polyethoxylated tallow amine 15 (POE-15) or other ethoxylated surfactants (POE-15 was found to have the most toxic substance effects on human cells of all the adjuvants evaluated). The formulations without ethoxylated surfactants were approximately 100 times less toxic to human tissue cells. The authors concluded that these results challenge the established recommended values for acceptable daily glyphosate intake because they are based on long-term exposure tests of glyphosate alone: "pesticides are always used with adjuvants that could change their toxicity, the necessity to assess their whole formulations as mixtures rather than glyphosate alone becomes obvious."[31]The results of these studies were at all times available to Defendant.

---

[30] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
[31] Mesnage, R., Bernay, B. Séralini, G. *Ethoxylated adjuvants of glyphosate-based herbicides are active principles of human cell toxicity*. Toxicology (2013) 313:122-8. doi:10.1016/j.tox.2012.09.006.

34

140.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiff's NHL. [32] Specifically, Dr. Farmer wrote an internal email cautioning "you cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement." She further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has not conducted a chronic carcinogenicity study on the formulated Roundup product.[33]

141.    Defendant thus knew or should have known, that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect consumers.

142.    Additionally, Monsanto knew, or should have known, that the contaminants and impurities in Roundup® render it more toxic than glyphosate alone, and that safety studies of Roundup® and its contaminants and impurities were necessary to protect consumers. Such contaminants and impurities include, but are not limited to, PCBs, PFAs, 1-4 dioxane, NNG, arsenic, formaldehyde, PMIDA, and other heavy metals.Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe and never conducted long-term cancer studies using Roundup. This was and is in clear violation of the FAO code of conduct which at all times required safety testing on both the "active"

---

[32] *See* Plaintiff'sPlaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[33] *See id.*

ingredient and the formulated product. This failure also violates Monsanto's pledge that the safety of its products was and is its highest priority.

### The EPA's Review of Glyphosate

143.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015. The EPA removed the documents by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the Agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[34]

144.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[35] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment. The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered formulated Roundup

_____

[34] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.
[35] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcinogenic_potential.pdf.

rather than studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[36]

145.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[37]

146.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel (SAP) meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA [SAP] on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[38]

147.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[39] The EPA has since withdrawn that decision.

---

[36] *Id.*
[37] *Id.*
[38] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.
[39] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

COMPLAINT AND JURY TRIAL DEMAND

148.    In June 2022, the Ninth Circuit Court of Appeals issued a decision invalidating EPA's 2020 glyphosate finding and ordering EPA to reevaluate its determination that glyphosate was not likely to cause cancer. The Court ruled that the EPA's conclusion was inconsistent with its own epidemiological evidence that shows a link between glyphosate exposure and the risk of NHL. The Court ruled that the EPA did not properly follow its scientific guidelines when it determined glyphosate was not carcinogenic: "EPA's errors in assessing human-health risk are serious. Moreover, no disruptive consequences will result from vacating the human-health portion of the interim decision because that portion simply maintained the status quo."[40]

149.    In September 2022, in response to the Ninth Circuit decision, the EPA withdrew the remaining portion of its 2020 decision regarding glyphosate. That means that the only current EPA decision on glyphosate's toxicity is from 1993.

### *Monsanto's Industry Ties*

150.    Documents produced in prior litigations reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to shield glyphosate and Roundup from scrutiny and review.

151.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland – former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016) – repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

---

[40] *Natural Resources Defense Council, et al v. U.S. Environmental Protection Agency*, 38 F.4th 34, 52 (9th Cir. 2022).

152.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's glyphosate review. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and … ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[41]

153.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. He reported that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . I am the chair of the CARC, and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[42] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier – in April 2015.

154.    Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, Mr. Rowland helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015 email discussed above, Mr. Jenkins explained that Mr.

---

[41] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

[42] *Id*.

Rowland wanted to help Monsanto stop the ATSDR's investigation concerning glyphosate's carcinogenicity.[43]

155.    Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland bragged: "If I can kill this I should get a medal."[44]

156.    Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[45] The ATSDR never published its toxicological profile of glyphosate.

157.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate. In an internal memorandum on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[46] Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observer for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[47]

158.    A 2019 article in Environmental Sciences Europe investigated the evidence behind the diametrically opposing conclusion on the genotoxicity of glyphosate-based herbicides from IARC in 2015 and the EPA in 2016. The authors report that the IARC Working Group relied

---

[43] *See id.*
[44] *Id.*
[45] *Id.*
[46] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis in original).
[47] *See* Plaintiff's Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

largely on peer-reviewed studies, 70% of which indicated genotoxic effects. In contrast, the U.S. EPA relied mainly on registrant-commissioned, industry-funded studies, 99% of which asserted no genotoxic effects. This is due in large part to the industry's refusal to test commercially sold Roundup® as a formulated product, therefore the EPA's evaluation was primarily based on glyphosate alone, while IARC's review more heavily weighted studies evaluating formulated glyphosate-based herbicides and its metabolites.[48]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

159.    The sale and/or use of Roundup® and/or glyphosate-based herbicides have been restricted in many countries around the world including:

a.  France;

b.  the Netherlands;

c.  Belgium;

d.  Portugal;

e.  Denmark;

f.  Austria;

g.  Italy;

h.  Thailand;

i.  certain regions of India.

j.  Vietnam

k.  Germany.

_____

[48] Benbrook, C.M. *How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?*. Environ Sci Eur 31, 2 (2019) *available at* https://doi.org/10.1186/s12302-018-0184-7.

41

COMPLAINT AND JURY TRIAL DEMAND

160.    Roundup® and/or glyphosate-based herbicides were set to be banned by the end of 2024 in Mexico, though the commitment is presently suspended.

Roundup and/or glyphosate-based herbicides are set to be banned by 2024 in Germany.

161.    The European Commission will task the European Union's chemical agency (ECHA) and food safety watchdog (EFSA) with reviewing the data associated with a new study from the Ramazzini Institute linking Roundup® to increased tumor rates in rats at does currently considered safe under European Union rules. Since the study's publication in June of 2025, the director of the Ramazzini Institute, Daniele Mandrioli, has confirmed that the raw data essential to verify the study's methodology, test material composition, and reported results will be shared with regulatory agencies upon request. A spokesperson for the European Commission has stated "If ECHA or EFSA would conform that glyphosate no longer meets the approval criteria or that the conditions of approval must be amended, the Commission will act immediately to amend or withdraw the approval."49

162.    On June 10, 2025, the much anticipated long-term animal safety study was completed by the Ramazzini Institute and published in Environmental Health. 'Carcinogenic effects of long-term exposure from prenatal life to glyphosate and [Roundup Bioflow®, or Roundup RangerPro®] in Sprague-Dawley rats,' was a 26-month, long-term study of carcinogenicity on rats found that exposure to glyphosate and glyphosate-based herbicides at does equivalent to the European Union's acceptable daily intake and no observed adverse effect level caused statistically significant, dose-dependent increased trends or incidences of: multiple benign

---

49 Alice Bergoënd. *Commission to seek review of new data linking glyphosate to higher cancer risk.* Euroactiv. June 17, 2025, *available at* https://www.euractiv.com/news/commission-to-seek-review-of-new-data-linking-glyphosate-to-higher-cancer-risk/.

COMPLAINT AND JURY TRIAL DEMAND

and malignant tumors of blood, skin, liver, thyroid, nervous system, ovary, mammary gland, kidney, urinary bladder, bone, endocrine pancreas, and circulatory system. The results indicate that, while glyphosate alone is capable of causing a number of benign and malignant tumors, GBHs co-formulants may enhance the carcinogenicity of glyphosate, particularly in the case of leukemia.[50] A co-author of the study stated: "Our findings reinforce IARC's classification of glyphosate as a probable human carcinogen and are consistent with experimental animal studies as well as human correlational and weight-of-evidence evaluations that have reported associations between glyphosate exposure and certain cancers, particularly hematological malignancies."[51]

### *California Proposition 65 Listing*

163.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment (OEHHA) published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[52] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Prop 65") requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause

---

[50] Panzacchi, S, Tibaldi, E, De Angelis, L, et al. *Carcinogenic effects of long-term exposure from prenatal life to glyphosate and glyphosate-based herbicides in Sprague-Dawley rats*. Environmental Health. 2025; 24(1):36. doi: 10.1186/s12940-025-01187-2.

[51] George Mason University. *International Study Reveals Glyphosate Weed Killer Causes Multiple Tyes of Cancer*. June 20, 2025, *available at* https://www.gmu.edu/news/2025-06/international-study-reveals-glyphosate-weed-killers-cause-multiple-types-cancer#:~:text=The%20GGS%20previously%20published,paper%20can%20be%20found%20here.

[52] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

COMPLAINT AND JURY TRIAL DEMAND

cancer or reproductive toxicity."[53] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[54]

164.    The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") triggered the listing.

165.    On March 28, 2017, OEHHA posted a Notice on its website that glyphosate would be added to the list of chemicals known to cause cancer for purposes of Prop 65. It remains on the list to this day.

166.    On April 13, 2022, EPA stated it would approve the modified Prop 65 warnings for glyphosate. The new Prop 65 warnings shall state: "Using this product can expose you to glyphosate. The International Agency for Research on Cancer classified glyphosate as probably carcinogenic to humans. US EPA has determined that glyphosate is not likely to be carcinogenic to humans; other authorities have made similar determinations. A wide variety of factors affect your potential risk, including the level and duration of exposure to the chemical."

### Statement of Concern Regarding Glyphosate-Based Herbicides

167.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks

---

[53] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).
[54] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

COMPLAINT AND JURY TRIAL DEMAND

associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[55] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[56] The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[57]

168.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

---

[55] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[56] *Id.*
[57] *Id.*

COMPLAINT AND JURY TRIAL DEMAND

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[58]

169.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argued, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[59]

170.    Among various implications, the researchers concluded that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, they noted that "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concluded that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[60]

171.    The researchers also critiqued the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from

---

[58] *Id.*
[59] *Id.*
[60] *Id.*

those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[61]

172.    The researchers also called for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[62]

173.    The researchers suggested that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[63]

---

[61] *Id.*
[62] *Id.*
[63] *Id.*

174.    Despite these stated concerns, Monsanto, to date, has failed to test its Roundup products.

### LPT Fraud in Glyphosate Testing

175.    Laboratory of Pharmacology and Toxicology (LPT) in Hamburg produced studies that were part of the study package for the EU-wide approval of glyphosate in December 2017. These studies fall under the Good Laboratory Practice (GLP) system. One in seven GLP certified studies in this package, which was the basis to grant re-approval for glyphosate, came from LPT.

176.    In 2020, LPT was found to have committed fraud in a series of regulatory tests.[64]

177.    The EU's classification of glyphosate as 'non-carcinogenic' and 'not genotoxic' is based in part on the European authorities' confidence in the GLP system. In the EU's assessment process, GLP studies are automatically classified as reliable. On the other hand, non-GLP studies from university research, which are peer reviewed and published, were disqualified by the authorities as "unreliable." Most of these disqualified studies have reported evidence of a genotoxic effect and an increased risk of lymphatic cancer.[65]

178.    Bayer AG (Monsanto's parent company) commissioned chemical safety studies to LPT for agrochemicals.

---

[64] Press Release, *Fraud in German Laboratory Casts Additional Doubts on the 2017 Re-Approval of Glyphosate and on the Entire EU Pesticide Safety Evaluation Procedure*, PESTICIDE ACTION NETWORK (Feb. 11, 2020), *available at* https://www.pan-europe.info/press-releases/2020/02/fraud-german-laboratory-casts-additional-doubts-2017-re-approval-glyphosate.
[65] Helmut Burtscher et. al, *Dangerous Confidence in "Good Laboratory Practice,"* CORPORATE EUROPE OBSERVATORY (2020), *available at* https://www.global2000.at/sites/global/files/2020-GoodLaboratoryPractice-en.pdf.

COMPLAINT AND JURY TRIAL DEMAND

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

179.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

180.    Plaintiff has suffered an illness (cancer) that has a latency period and does not arise until years after exposure. Plaintiff had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup until Plaintiff was made aware that his NHL could be caused by his use of and/or exposure to Roundup. Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that Plaintiff knew that his NHL was linked to his use of and/or exposure to Roundup.

181.    Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

182.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of or exposure to Roundup, nor would a reasonable and diligent investigation by him have disclosed that Roundup would cause his NHL.

183.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment*

184.    The statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed and continues to conceal from Plaintiff the true risks associated with use of or exposure to Roundup.

185.    The statute of repose has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed and continued to conceal from Plaintiff the true risks associated with use of or exposure to Roundup.

186.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

187.    Defendant is estopped from relying on any statute of limitations or statute of repose because of its concealment of the truth regarding the safety of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was material and not available to Plaintiff, his medical providers, and/or his health facilities, yet it failed to disclose the information to the public.

188.    Defendant had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff could not have afforded to conduct nor could have possibly conducted studies to determine the nature, extent and identity of health risks associated with pesticide exposure, including Roundup, and, therefore, Plaintiff relied upon Defendant's representations.

### *Estoppel*

189.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information

concerning its glyphosate-based products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

190.　　Instead, Monsanto knowingly, affirmatively, and actively concealed and continues to conceal safety information concerning Roundup and the serious risks associated with the use of and/or exposure to its products.

191.　　Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE: NEGLIGENCE

192.　　Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

193.　　Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

194.　　Defendant, directly or indirectly, caused Roundup products to be purchased and/or used by Plaintiff.

195.　　Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, advertising, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created an increased risk of injury or illness to people, which are permanent and lasting in nature, physical pain, mental anguish, the need for lifelong medical treatment, monitoring, and care.

196.　At all relevant times, Defendant breached its duty to Plaintiff and was otherwise negligent in marketing, designing, advertising, packaging, labeling, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup products.

197.　At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

198.　At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate and other hazardous chemicals contained in Roundup.

199.　At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup could cause Plaintiff injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

200.　Defendant knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, including adjuvants, the surfactant POEA and other surfactants, and/or "inert" ingredients were necessary to protect Plaintiff from Roundup.

201.　Defendant failed to properly test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

202.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to establish the full extent of risks associated with Roundup use.

203.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware or in the exercise of reasonable diligence would not become aware of the risks and/or the magnitude of the risks associated with the use of and/or exposure to Roundup.

204.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects to people who used and/or we exposed to it, and failed to prevent or adequately warn of these risks and injuries.

205.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of and/or exposure to Roundup and glyphosate.

206.    The negligence by the Defendant, its agents, servants, and/or employees included but was not limited to the following actions and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough

pre- and post-market testing;

b.  Failing to test Roundup and/or failing to adequately, sufficiently and properly test Roundup as formulated;

c.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

d.  Failing to undertake proper and sufficient studies and conduct necessary tests to determine whether the use of or exposure to Roundup products and glyphosate-containing products were safe for human health and for their intended use in agriculture, horticulture, and at-home use;

e.  Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants Defendant claims are "inactive" contained within formulated Roundup products and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether "inert" ingredients and/or adjuvants were safe for use;

f.  Failing to use reasonable and prudent care in the design, research, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the use of Roundup and/or glyphosate as an herbicide;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to

those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup products;

h.  Failing to adequately and properly warn the Plaintiff, the general public, the medical community, the agricultural professional community, and the EPA about the dangers of glyphosate;

i.  Failing to disclose to Plaintiff, other Roundup users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

j.  Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

k.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects from the use of or exposure to Roundup and glyphosate-containing products;

l.  Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known that the products were unsafe, unfit, and could cause harm to human health;

m.  Refusing to make or propose any changes to Roundup products' packaging, labeling, or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

n.  Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to

Roundup and glyphosate;

o.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are safe for use in the agricultural, horticultural industries, and/or for home use;

p.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous to humans who use or are exposed to them.

q.  Failing to petition the EPA to strengthen the warning label associated with Roundup;

r.  Marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous properties;

s.  Designing Roundup in a manner that was dangerous to, unsafe, and unfit for consumers;

t.  Formulating Roundup in a manner that was dangerous to and unsafe and unfit for consumers;

u.  Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and failing to inform EPA of adverse information in violation of EPA regulations;

v.  Improperly concealing and/or misrepresenting information from the Plaintiff, the scientific and medical communities, and the EPA, concerning the severity of risks and dangers associated with glyphosate-based herbicides including Roundup-branded products; and,

w.  Improperly selling Roundup with a false and misleading label and package.

COMPLAINT AND JURY TRIAL DEMAND

207.    Defendant deceptively compared and compare the safety risks and dangers of Roundup with table salt and other common, everyday items.

208.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the design, advertising, manufacturing, marketing, packaging, labeling, distribution, and sale of Roundup.

209.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup and its active ingredient glyphosate.

210.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

211.    Defendant's conduct was reckless. Defendant regularly risks the lives of consumers and users of its Roundup products, including Plaintiff with full knowledge of the dangers of its products. Defendant has made conscious decisions not to re-design, re-package, re-label, warn, and/or inform the unsuspecting public, including Plaintiff, about its products' dangers to human health. Defendant's reckless conduct therefore warrants an award of punitive damages.

212.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate and/or Roundup, Plaintiff developed NHL and has been injured catastrophically and has been caused severe and permanent pain, physical and mental suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

213.    WHEREFORE, Plaintiff prays for judgment against Defendant in a fair and reasonable sum, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT PRODUCTS LIABILITY FOR DEFECTIVE DESIGN

214.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

215.    Plaintiff brings this strict liability claim against Defendant for defective design.

216.    At all relevant times, Defendant engaged in designing, researching, developing, manufacturing, marketing, selling, distributing, and promoting Roundup. These actions were under Defendant's ultimate control and supervision.

217.    Defendant's Roundup products were expected to and did reach the anticipated consumers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

218.    The Roundup products that Defendant placed in the stream of commerce were and are defective and unreasonably dangerous to consumers and those exposed, including Plaintiff.

219.    Defendant designed, researched, developed, formulated, manufactured, produced, assembled, labeled, packaged, advertised, promoted, marketed, sold, and distributed the Roundup to which the Plaintiff was exposed.

220.    At all times relevant to this litigation, Defendant's Roundup products were designed, packaged, and labeled in an unsafe, defective, and inherently dangerous manner such that the products posed serious health risks to individuals using or exposed to the products in the intended or a reasonably foreseeable manner.

221.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, packaged, labeled, and marketed by Defendant.

222.    Therefore, at all relevant times to this litigation, Defendant's Roundup products, as researched, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and unsafe, in one or more of the following ways:

    a.  When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

    b.  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

    d.  Defendant did not sufficiently test, investigate, or study Roundup and, specifically, the active ingredient glyphosate.

    e.  Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use

of the herbicide.

f.  Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.  Defendant could have employed safer alternative designs and formulations.

223.    At all times relevant to this litigation, Plaintiff used and/or was exposed to Defendant's Roundup in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

224.    Defendant had a duty to create a product that was not unsafe and unreasonably dangerous for its normal, intended use.

225.    Defendant designed a product that was and is unreasonably dangerous for its normal, intended use.

226.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup before or at the time of exposure.

227.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design and/or formulation was attainable.

COMPLAINT AND JURY TRIAL DEMAND

228.    Defendant designed, researched, manufactured, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

229.    As a direct and proximate result of the defective design of Roundup products, Plaintiff developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

230.    Due to the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

231.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

232.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff suffered and continues to suffer grave injuries, and Plaintiff has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

233.    Defendant's conduct was committed with knowledge, reckless, conscious, wanton, willful and deliberate disregard for the value of a human life, the rights and safety of consumers, including Plaintiff.

COMPLAINT AND JURY TRIAL DEMAND

234.    WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE: STRICT PRODUCTS LIABILITY FOR FAILURE TO WARN

235.    Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

236.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

237.    At all relevant times, Defendant engaged in developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

238.    Defendant researched, developed, designed, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released Roundup products into the stream of commerce, and directly advertised or marketed the products to consumers, including Plaintiff. Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and a duty to instruct on the proper, safe use of these products.

239.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use

and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

240.    Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

241.    At all times relevant to this litigation, Defendant failed to investigate, study, or test the safety of its Roundup products.

242.    Despite the fact that Defendant knew or should have known that Roundup products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

243.    Defendant wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

244.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, packaged, labeled, and marketed by Defendant.

245.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

246.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

247.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural, horticultural, and residential applications.

248.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and/or home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and/or misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

249.    To this day, Defendant has failed to adequately and accurately warn of Roundup's risks to people who use or are exposed to it and the resultant injuries from such use or exposure, such as those suffered by Plaintiff.

250.    To this day, Defendant has failed to adequately test, investigate, or study its Roundup products.

251.    As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

252.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

253.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

254.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries.

255.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce and failing to warn Plaintiff of the increased risk of NHL associated with the use of and/or exposure to Roundup products as described herein, Plaintiff developed NHL and was injured catastrophically and was caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic

damages, including for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

256.     WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: BREACH OF EXPRESS WARRANTIES

257.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

258.     At all relevant times, Defendant engaged in developing, designing, formulating, manufacturing, advertising, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to users and those in proximity to users, including Plaintiff. These actions were under the ultimate control and supervision of Defendant.

259.     Before the time that Plaintiff was exposed to Roundup products, Defendant expressly warranted to its consumers and users – including Plaintiff – that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended, specifically, as herbicides.

260.     Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup carries an increased risk of developing severe injuries, including Plaintiff's injuries.

261.     Defendant further failed to adequately test, investigate, or study its formulated Roundup products.

262.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of

the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

263.    Roundup did and does not conform to the representations made by Monsanto as Roundup was and is not safe for use by individuals such as Plaintiff.

264.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

265.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate exposure and/or use.

266.    Defendant's breaches constitute violations of state common and statutory laws, including but not limited to, the following statutory provisions as applicable to Plaintiff in this Petition:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017).

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28:2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302(c) (2017).

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017).

- Md. Code Ann., Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017)

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016).

- N.H. Rev. Stat. Ann. § 382-A:2-313, et seq. (2017);

- N.J. Rev. Stat. § 12A:2-313 (2022);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); *see also* UJI 13-1428 to 1433 NRMA (2016).

- N.Y. U.C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R.I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code. Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat. Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

267.    The breach of the warranty was a substantial factor in bringing about the Plaintiff's injuries. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce and failing to warn Plaintiff of the increased risk of NHL associated with the use of and/or exposure to Roundup products as described herein, Plaintiff developed NHL and was injured catastrophically and was caused severe and permanent pain, suffering,

disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

268.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

269.    WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE: BREACH OF IMPLIED WARRANTIES

270.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

271.    At all relevant times, Defendant engaged in developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff. These actions were under the ultimate control and supervision of Defendant.

272.    Before Plaintiff was exposed to Roundup, Defendant impliedly warranted to its consumers and users – including Plaintiff – that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

273.    Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

274.    Defendant further failed to adequately test, investigate, or study its formulated Roundup products.

275.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

276.    The Roundup products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

277.    At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiff, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup.

278.    Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used or was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

279.    In reliance upon Defendant's implied warranty, Plaintiff used or was in proximity to the use of Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

280.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

281.    Defendant breached its implied warranty to Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or tested. Roundup has

dangerous propensities when used as intended and can cause serious injuries, including those injuries suffered by Plaintiff.

282.    Defendant's Roundup products were more dangerous than an ordinary consumer or user would expect.

283.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

284.    WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX: FRAUDULENT CONCEALMENT

285.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

286.    Monsanto's conduct relating to the manufacture and sale of Roundup has been fraught with deception and fraud with the intent of concealing from regulators and Roundup users the dangers of its Roundup products. Monsanto's fraudulent conduct was intended to conceal the truth about the dangers of its Roundup products from regulators and Roundup users.

287.    Monsanto took repeated measures to conceal peer-reviewed scientific studies showing that glyphosate and Roundup use and/or exposure cause serious personal injuries, including that it can cause NHL. For example, Defendant concealed and conceals to this day the genotoxicity of Roundup from regulators and Roundup users. Internally, Monsanto executives acknowledged that the company was in a "genotox hole." But rather than conduct studies on

Roundup's genotoxicity, Monsanto instead took affirmative steps to hire a world-renowned genotoxicologist in the hopes of downplaying the then-emerging science about glyphosate's and Roundup's genotoxicity. When that genotoxicologist refused to deny Roundup's genotoxicity, Monsanto fired him, made him sign a non-disclosure agreement, failed to provide the adverse information to the Environmental Protection Agency as it was legally required to do, and ghost wrote a "scientific" paper that concluded that Roundup is not genotoxic.

288.    Defendant states in its advertising, promotion, marketing, and public statements that Roundup is safe, even though Monsanto has never tested the formulated product Roundup. Defendant further misleads consumers, such as Plaintiff, by creating marketing and promotional material that states that Roundup is safer than table salt, apple cider vinegar, and chocolate. The NYAG sued Monsanto, now twice, for misrepresenting the safety of Roundup to its citizens in its advertising and promotional materials, including the aforementioned statements. Specifically, the NYAG sued Monsanto recently for false and deceptive advertising practices, and Monsanto paid $6.9. million dollars in a fine to resolve that lawsuit. Monsanto knew that such statements are false and misleading as the NYAG had previously sued Monsanto in 1996, prior to Bayer AG's acquisition of Monsanto, for making similar false and misleading statements about Roundup's safety.

289.    Monsanto consistently engaged and continues to engage in conduct for the purposes of spreading false and misleading information about Roundup's safety and concealing relevant and consistent information that was in Monsanto's possession about its Roundup products' dangers so that regulators and the public would be lured into believing Roundup is not carcinogenic.

290.   Plaintiff could not have known about the information that Monsanto publicly withheld or that its public statements were orchestrated to create a false narrative about Roundup's safety and relied on Monsanto's public representations.

291.   Plaintiff would not have used Roundup or would have protected himself when using Roundup if Monsanto had disclosed the facts it withheld.

292.   Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiff with the intent that Plaintiff and other consumers and users of Roundup would rely on such material representations.

293.   Monsanto is estopped from asserting a statute of repose defense because it fraudulently concealed its wrongful conduct from the general public, including Plaintiff, with the intent that Plaintiff and other consumers and users of Roundup would rely on such material representations.

294.   Monsanto had actual knowledge that exposure to Roundup and specifically, its active ingredient glyphosate, could cause cancer and other severe illnesses and injuries. Monsanto also knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, and its surfactants, adjuvants and other "inert" ingredients showed they could cause cancer. Monsanto further knew or should have known that concealing the information about Roundup's dangers from Plaintiff prevented him from taking steps to protect himself from exposure to Roundup.

295.   Monsanto failed to conduct adequate testing of glyphosate and the Roundup formulation.

296.   Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Monsanto

perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff and the public at large. Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

297.    Plaintiff was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and was injured as a direct and proximate result.

298.    Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiff and the general public of the inaccuracy of said misrepresentations. Such omissions constitute a positive misrepresentation of material fact, made with the intent to induce Plaintiff and the public to rely on Defendant's misrepresentations as material information in making the determination to purchase and how to use Roundup products.

299.    Plaintiff did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiff was injured as a result.

300.    Monsanto, as the innovator of Roundup, was and is in a position of superior knowledge and judgment regarding any potential risks associated with its products.

301.    Monsanto's misrepresentations and concealments had and have the propensity to deceive others or constitute an injury to public interests or public policy. Monsanto's misrepresentations and concealments thereby constitute constructive fraud and breach one or more legal or equitable duties owed to Plaintiff relating to Roundup.

302.    In breaching its duties to Plaintiff, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup to increase sales of its products at the expense of

informing Plaintiff that use of or exposure to Roundup carries the risk of serious illness, such as NHL.

303.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

### COUNT SEVEN: VIOLATION OF MISSOURI MERCHANDISING PRACTICE ACT, § 407.020 et seq.

304.    Plaintiff incorporates by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

305.    The Missouri Merchandising Practices Act (the MMPA) provides that "[t]he act, use or employment by any person of any deception . . . [or] unfair practice, or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice." Mo. Rev. Stat. §407.020.1.

306.    The enabling regulations for the MMPA define an "unfair practice" as conduct that (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes a risk of substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; or (6) is unlawful. See Mo. Code Regs. Ann. tit. 15, § 60-8.

307.    Under the MMPA, the term "merchandise" is broadly defined to include "any objects . . . or services." Mo. Rev. Stat. § 407.020.4. Roundup is "merchandise" within the scope of the MMPA.

308.    The MMPA authorizes private causes of action. Mo. Rev. Stat.§ 407.025.1. Plaintiff is entitled to bring suit and recover under the MMPA.

309.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup.

310.    At all relevant times, Defendant, through its labeling, packaging, advertisements, public representations, and marketing of Roundup, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup products are safe for use.

311.    At all relevant times, Defendant also engaged in the concealment, suppression, and/or omission of material facts in connection with the sale and/or advertisement of Roundup products in trade or commerce. In particular, Defendant failed to disclose to the public that Roundup is unsafe and poses serious health hazards, particularly NHL. Defendant was aware of the hazardous risks posed by Roundup and yet failed to inform the public of these risks through their advertisements, packaging, labeling, or other means available to them. Defendant's failure to state materials facts about Roundup constitutes a violation of V.A.M.S. § 407.020.

312.    At all relevant times, Plaintiff was deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup.

313.    At all relevant times, Plaintiff acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiff would not have purchased Roundup and/or would have protected themselves from exposure to Roundup.

314.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiff developed NHL and has been injured catastrophically and has been caused severe and permanent

pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

315.    WHEREFORE, Plaintiff prays for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT EIGHT: DAMAGES

316.    Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

317.    Defendant knew of the dangerous condition of Roundup products, including that they posed a danger to its consumers and non-consumers exposed to Roundup products, including Plaintiff, but chose not to include any warnings or information regarding the dangerous condition of Roundup products.

318.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiff by its conduct described herein. Defendant knew or should have known failure to include a warning for Roundup products would result in individuals using and/or being exposed to Roundup products and subsequently developing NHL.

WHEREFORE, Plaintiff prays for judgment against Defendant for:

a.    compensatory damages in an amount to be proven at trial;

b.    punitive damages;

c.    costs, including reasonable attorneys' fees, court costs, and other litigation expenses;

d.    damages for loss of consortium and/or society according to proof; and

e.    any other relief the Court may deem just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues.

Dated: February 19, 2026                    Respectfully submitted,

*/s/ Robert Quigley*
Robert J. Quigley
**WEITZ & LUXENBERG, P.C.**
1880 Century Park E, Suite 700
Los Angeles, CA 90067
Telephone: 212-558-5829
rquigley@weitzlux.com

Robin L. Greenwald, Esq. (*Pro Hac Vice*)
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5802
Facsimile: (212) 344-5461
rgreenwald@weitzlux.com

*Attorneys for Plaintiff*

COMPLAINT AND JURY TRIAL DEMAND

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 19, 2026, a true and correct copy of the foregoing has been filed through the Court's CM/ECF case management system, which will serve a notice of electronic filing to all counsel of record.

*/s/ Robert Quigley*

COMPLAINT AND JURY TRIAL DEMAND